UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

NIEL VENABLE,

                      Plaintiff,

-vs-                                  Case No.  2:10-cv-00187-DNF

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

                      Defendant.

_____

## OPINION AND ORDER

The Plaintiff, Niel Venable, seeks judicial review of the final administrative decision of the Commissioner of the Social Security Administration ("SSA") denying his claims for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions. For the reasons set out herein, the decision of the Commissioner is **AFFIRMED in part,** and **REVERSED AND REMANDED in part**, pursuant to §205(g) of the Social Security Act, 42 U.S.C §405(g).

**I. Social Security Act Eligibility, Procedural History, and Standard of Review**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §

-1-

§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

**A. Procedural History**

On April 6, 2007, the Plaintiff filed applications for a period of disability, DIB, and SSI for the period beginning August 31, 2005. (Tr. 13, 95, 105). His claims were denied initially on October 5, 2007, and upon reconsideration on February 1, 2008. (Tr. 56-58, 68). On July 21, 2009, a hearing was held before Administrative Law Judge ("ALJ") Scott A. Tews. (Tr. 25). The ALJ denied the Plaintiff's claims in a decision dated September 9, 2009. (Tr. 13-22). On January 22, 2010, the Appeals Council denied the Plaintiff's Request for Review. (Tr. 1-5). On March 25, 2010, the Plaintiff filed a complaint against the Commissioner of the SSA, thus commencing this suit. (Doc. 1).

**B. Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion. Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439(11th Cir. 1997); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)). In conducting this review, this Court may not reweigh the evidence or substitute our judgment for that of the ALJ, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Martin v. Sullivan*, 894 F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, the district court will reverse the Commissioner's decision on plenary review if the

decision applied incorrect law, or if the decision fails to provide sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). The Court reviews de novo the conclusions of law made by the Commissioner of Social Security in a disability benefits case. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The first step is considering work activity. If the claimant is doing any substantial gainful activity he is not disabled. 20 C.F.R. § 404.1520(a)(4)(I). The second step considers the medical severity of the impairment: if there is not a severe medically determinable physical or mental impairment, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). The third step also considers the medical severity of the impairment. If the claimant has an impairment that meets or equals one of the listings and meets the duration requirement, the claimant will be found to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The fourth step is assessing the residual functional capacity of the claimant, and the claimant's past relevant work. If the claimant can still do his past relevant work, he will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(iv). The fifth step considers the residual functional capacity as well as the age, education, and work experience of the claimant to see if he can make an adjustment to other work. If the claimant can make an adjustment to other work, the claimant will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(v). The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287; *see also Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001). Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II. Review of Facts

### A. Background Facts

The Plaintiff was born on June 22, 1965, and was 40 years old on the alleged disability onset date. (Tr. 20, 97).  He has a high school education and is able to communicate in English. (Tr. 20).  He formerly worked as a roofer and welder. (Tr. 20, 28).  The Plaintiff alleges disability due to a variety of painful spinal conditions.  Due to these conditions, the Plaintiff alleges he has been unable to work since August 2005. (Tr. 32).

### B. The ALJ's Findings

At step one, the ALJ found that the claimant meets the insured status requirements of the Social Security Act through March 31, 2010, and has not engaged in substantial gainful activity since August 31, 2005. (Tr. 15).

At step two, the ALJ found that the Plaintiff has the following severe impairments: 1) arthralgia, 2) arthropathy, 3) coronary artery disease, 4) L5-S1 radiculitis, 5) hypertension, 6) failed back syndrome, 7) alcohol abuse, and 8) ETOH withdrawal seizures. (Tr. 15).  The ALJ made these findings after review of the medical evidence of record, and determined that these impairments impose more than minimal limitations on Plaintiff's ability to function. (Tr. 15).

However, at the third step, the ALJ found that the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 16).

At the fourth step, the ALJ found that the Plaintiff "has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except he cannot climb ladders, ropes or scaffolds and must avoid concentrated exposure to hazardous machinery." (Tr. 17).  In making this

finding, the ALJ states he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of [the applicable CFR and SSR sections]" and "also considered opinion evidence in accordance with the requirements of [the applicable CFR and SSR sections]." (Tr. 17).  Next, the ALJ found that the Plaintiff's residual functional capacity precluded him from performing his past relevant work as a roofer and welder. (Tr. 20).

At the fifth step, the ALJ found that considering the Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." (Tr. 21).  Based upon the testimony of the vocational expert, the ALJ determined that the Plaintiff could perform light work despite the additional limitations (i.e., that he cannot climb ladders, ropes, or scaffolds; and that he must avoid concentrated exposure to hazardous machinery) to his residual functional capacity. (Tr. 21).  Based on these findings, the ALJ concluded that the Plaintiff was not disabled. (Tr. 21).

### C. Plaintiff's Medical History

Beginning in July, 1999, the Plaintiff began treatment with Dr. Desmond Hussey, M.D., a neurologist, for chronic low back and left leg pain. (Tr. 387).  An MRI of the Plaintiff's lower back revealed that he suffered from a herniated disk at the L5-S1. (Tr. 388).  The Plaintiff was maintained on Lortabs for pain management and underwent epidural steroid injections in November, 1999, and January, 2000. (Tr. 389, 391, 393).  The Plaintiff did not respond to these procedures and was advised to undergo surgery. (Tr. 394). The Plaintiff chose not to do so, mainly due to lack of funds and out of fear of surgery. (Tr. 36, 400).

Between 2000 and 2009 the Plaintiff made regular visits to Dr. Hussey's office for follow-ups.

-5-

Physical examinations of the Plaintiff consistently revealed that his left straight-leg raise and Bragard sign reproduced pain down his left leg, but that strength was preserved, and that the Plaintiff's sensory and motor functions were intact. (Tr. 281-305, 328-75, 404-06).  Also, Dr. Hussey noted numerous times that the Plaintiff could ambulate without difficulty. (Tr. 405).  Throughout this period,  the Plaintiff's pain was managed on a variety of opioids including Lorcet, Methadone, Oxycodone and Percocet. (Tr. 357-58, 369-75).

In December 2006, the Plaintiff was admitted to the emergency room after the Plaintiff suffered a seizure. (Tr. 233).  The Plaintiff reported intermittent chest tightness with shortness of breath and palpitations and was diagnosed with atrial fibrillation. (Tr. 233).  Various tests ruled out myocardial infarction, and the Plaintiff was found to have essentially normal cardiac function. (Tr. 241).  Doctors noted that the Plaintiff was an alcoholic and ultimately determined that the Plaintiff's atrial fibrillation was caused by a 3 to 4 day history of alcohol withdrawal. (Tr. 239).

In October 2007, the Plaintiff was admitted to the hospital for chest pain associated with jaw discomfort. (Tr. 276).  Various tests ruled out myocardial infarction, ischemia, or scarring. (Tr. 278).  The Plaintiff had no further chest or jaw pain and was released from the hospital. (Tr. 278).

**D. Medical Evidence**

On July 13, 1999, the Plaintiff visited Dr. Hussey for a neurologic consultation. (Tr. 366).  During the consultation, the Plaintiff complained of progressive pain that started gradually in April of 1999. (Tr. 366).  According to the Plaintiff, a sharp pain radiated down the back of his left leg, into his calf, tingling in the 4th and 5th toes. (Tr. 366).  After a physical examination, Dr. Hussey found the Plaintiff healthy and pleasant, except for the pain in his leg. (Tr. 366).  Also, Dr. Hussey found that the Plaintiff's "gait is steady with good ability to tandem walk." (Tr. 367).  Dr. Hussey prescribed pain medications and anti-

inflammatories to the Plaintiff and ordered an MRI to be performed on the Plaintiff's lumbar spine. (Tr. 367).

On July 13, 1999, an MRI was performed on the Plaintiff's lumbar spine region. (Tr. 387).  At the Plaintiff's L5-S1, the MRI showed there was "prominent desiccation of the disc space and some vertebral body endplate changes" and "a left paracentrla disc protrusion with a small fragment that appears to be abutting the descending S1 nerve root." (Tr. 387).  Finally, the MRI showed that at the Plaintiff's T12-L1, L1-2, and L4-5, there was "desiccation of the disc space with mild posterior bulging of the annulus minimally effacing the ventral thecal sac without significant central canal or foraminal compromise". (Tr. 387).

On July 19, August 25, and September 22, 1999, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 388-90).  On these visits, Dr. Hussey found that the Plaintiff suffered severe pain going down his buttock and leg into his calf. (Tr. 388-90).  Physical examinations performed on these dates revealed that the Plaintiff was able to ambulate without difficulty, that his straight-leg raise was positive, and that he had preserved strength. (Tr. 388-90).  During these visits, Dr. Hussey advised the Plaintiff to undergo a trial of epidural steroids. (388-90).

On November 30, 1999, the Plaintiff was given an epidural steroid injection to his left L5-S1. (Tr. 391).  During a follow-up to the procedure on January 3, 2000, Dr. Hussey found that the Plaintiff had only a minimal response to the epidural and that he still continued the same radicular pain in the left leg. (Tr. 392).  A physical examination revealed the Plaintiff's straight-leg raise was positive at about 45 degrees on the left side which increased with Bragard sign and his sensory and motor exams were intact. (Tr. 392).  Dr. Hussey advised one more trial of epidural steroids and advised the Plaintiff to get a surgical evaluation. (Tr. 392).

On January 18, 2000, the Plaintiff was administered another epidural steroid injection to his L5 region. (Tr. 393). On February 18, 2000, Dr. Hussey still found that the Plaintiff suffered from the same type of pain in his left buttocks and down the back of his leg, despite the epidurals. (Tr. 394). A physical examination revealed that the Plaintiff's straight-leg raise was positive on the left and was increased with Bragard sign, that he still had preserved motor function, and that "he ambulates with a little antalgia, favoring the left leg." (Tr. 394). Dr. Hussey advised the Plaintiff that the only thing that would benefit him was microdiscectomy surgery, to which the Plaintiff, as before, showed aversion. (Tr. 394).

On March 29, 2000, August 27 and November 26, 2001 and February 25, 2002, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 395-98). In his follow-up notes to these visits, Dr. Hussey remarked that the Plaintiff was generally much improved and doing well on his medication. (Tr. 395-98). Despite this, Dr. Hussey consistently noted the Plaintiff's complaints of pain, specifically that it sometimes causes the Plaintiff to fall to his knees. (Tr. 398). Physical examinations of the Plaintiff on these dates revealed that he ambulated without difficulty and that he had intact sensory and motor exams. (Tr. 395-98). Dr. Hussey also noted that the Plaintiff preferred to treat his condition with maintenance opioids rather than undergo surgery. (Tr. 396-98).

On June 26, September 30, and December 18, 2002 and March 19, June 25, and October 1, 2003, the Plaintiff visited Dr. Hussey for neuroloical follow-ups. (Tr. 363-65, 399-400). Dr. Hussey noted that the Plaintiff continued to experience chronic pain down the back of his leg. (Tr. 363-65, 399-400). Physical examinations performed during these visits showed that the Plaintiff's straight-leg raise was positive on the left side and that sensory and motor functions were preserved. (Tr. 399). Dr. Hussey's follow-up notes reveal the Plaintiff continued to express an aversion to surgery, mainly due to cost. (Tr. 400).

On December 18, 2002, and March 19, June 25, and October 1, 2003, the Plaintiff made neurological follow-up visits to Dr. Hussey. (Tr. 363-65, 400-01). Physical examinations on these visits generally revealed that the Plaintiff had a positive straight-leg raise which increased with Bragard sign, that he had intact sensory and motor function, and that he had preserved strength. (Tr. 363-65, 400-01). Dr. Hussey expressed a desire to reimage the Plaintiff's back but could not do so due to insurance issues. (Tr. 363).

On January 7, April 7, July 12, and October 12, 2004, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 359-62). In his follow-up notes to these visits, Dr. Hussey consistently noted the Plaintiff's chronic pain, normal sensory and motor function, and positive straight-leg raise. (Tr. 359-62). During the January 7 visit, Dr. Hussey confronted the Plaintiff regarding whether he was selling his pain medications. (Tr. 362). Although Dr. Hussey wrote in his notes that he did not get the impression that the Plaintiff would ever do such a thing, Dr. Hussey eventually determined that he may randomly drug test the Plaintiff. (Tr. 362). On the July 12 and October 12 follow-ups, Dr. Hussey noted that the Plaintiff was stable and using his medications appropriately. (Tr. 359-60).

On February 7, May 9, August 15, and November 28, 2005, and March 20, June 26, and October 2006 the Plaintiff continued his neurological follow-ups with Dr. Hussey. (Tr. 297-303, 329-31). Dr. Hussey noted the Plaintiff's continued pain in his examination notes to these visits. (Tr. 297-303, 329-31). Physical examinations performed at these visits revealed that the Plaintiff's straight-leg raise and Bragard sign reproduced radicular pain. (Tr. 297-303, 329-31). Also, Dr. Hussey noted that the Plaintiff's sensory and motor functions were normal. (Tr. 297-303, 329-31).

On December 20, 2006, the Plaintiff was admitted to the Physicians Regional Medical Center emergency department due to a seizure. (Tr. 233). The Plaintiff's wife stated that she had witnessed the

Plaintiff experience generalized tonic/clonic activity and the Plaintiff bite his tongue during the episode. (Tr. 233).  The Plaintiff reported that he was experiencing chest pains and was subsequently diagnosed with atrial fibrillation. (Tr. 233, 239).  The Plaintiff had abruptly quit drinking alcohol and taking Xanax a few days before the seizure and doctors attributed the seizure and atrial fibrillation to alcohol withdrawal. (Tr. 239).  During his admission at the hospital, the Plaintiff admitted to having an alcohol problem and was counseled to attend Alcoholics Anonymous. (Tr. 241).  The Plaintiff was discharged to home on December 21, 2006, when he spontaneously returned to sinus rhythm. (Tr. 241).

On January 3, January 29, April 30, and August 1, 2007, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 286-94).  Dr. Hussey noted that the Plaintiff's chronic left leg pain continued. (Tr. 286-94).  Physical examinations performed during these visits revealed that the Plaintiff could ambulate without difficulty and had normal sensory and motor functions. (Tr. 286-94).  During the January 3 visit, Dr. Hussey informed the Plaintiff that he must show proof of getting help for his alcohol addiction and must pass a random drug test within two weeks. (Tr. 295).  In his notes, Dr. Hussey commented that the Plaintiff "ha[d] really reached his last straw." (Tr. 294).  A drug test was administered to the Plaintiff during the January 29 visit. (Tr. 292).

On October 12, 2007, the Plaintiff was admitted to the hospital with what the Plaintiff described as chest discomfort associated at times with jaw discomfort, which awoke him at night. (Tr. 276).  The Plaintiff was ruled out for myocardial infarction with serial cardiac enzymes and EKGs. (Tr. 278).  An echocardiogram of the Plaintiff showed a dilated left ventricle with preserved systolic function and an estimated ejection fraction of 60% to 65%. (Tr. 278).  Further, the Plaintiff had "enlarged left and right atrium with dilated right ventricle with diffuse global hypokinesis consistent with dilated cardiomyopathy. (Tr. 278).  Also, the echocardiogram revealed "no evidence of myocardial ischemia or scarring." (Tr. 278).

Despite these conditions, the Plaintiff did not feel any chest or jaw pain during his hospitalization and was subsequently released from the hospital the same day he was admitted. (Tr. 278).

On November 1, 2007 and January 7, 2008, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 281, 352). Dr. Hussey related that the Plaintiff continued to have pain in his left buttock and that it occasionally went down the left leg. (Tr. 281, 353). Dr. Hussey noted that the Plaintiff had started blood pressure medicine but that his blood pressure was still running high. (Tr. 281). Physical examinations performed during these visits revealed that the Plaintiff ambulated without difficulty and had normal sensory and motor function. (Tr. 282, 353).

Also, on January 7, 2008, Dr. Hussey also performed a Medical Assessment of Ability to Do Work-Related Activities (Physical) of the Plaintiff[1]. (Tr. 377). In his assessment, Dr. Hussey found that the Plaintiff could lift 5 pounds and 15 pounds as a maximum, could stand for 8 hours daily and 30 minutes without interruption, and that the Plaintiff could only sit for 30 minutes without interruption. (Tr. 377). Also, Dr. Hussey found that the Plaintiff could occasionally climb and balance, but could never stoop, crouch, kneel, or crawl. (Tr. 378). Dr. Hussey found that the Plaintiff's ability to reach, feel, see, speak, hear, push, pull, and handle objects were unaffected by the Plaintiff's condition. (Tr. 379). Also, Dr. Hussey did not find that the Plaintiff's condition precluded him from encountering any environmental conditions. (Tr. 379). Finally, Dr. Hussey found that the Plaintiff's condition would cause him to have several exacerbations per year that would interfere with his activities of daily living and would prevent him from doing anything for several days. (Tr. 380).

On March 25, June 18, August 11, September 22, and December 15, 2008, the Plaintiff visited Dr.

---

[1]On July 1, 2009, Dr. Hussey renewed his opinion provided in the Medical Assessment of Ability to Do Work Related Activities (Physical) dated January 7, 2008. (Tr. 376).

Hussey for neurological follow-ups. (Tr. 338-49).  Physical examinations performed during these visits generally revealed that the Plaintiff's straight-leg raise and Bragard sign reproduced radicular pain in his left leg. (Tr. 338-49).  After the March 25 visit, Dr. Hussey noted that the Plaintiff had been "working pretty vigorously," although he did not specify the type of work he believed the Plaintiff had been performing. (Tr. 349).  On June 18, Dr. Hussey reported that the Plaintiff had a fall on his coccyx and was having some coccydynia in addition to his chronic neuropathic pain in his left leg and buttock. (Tr. 346).  During the August 11 visit,  Dr. Hussey noted that the Plaintiff had fractured his left foot and was wearing a protective boot for 6 weeks. (Tr. 343).

On March 9 and December 14, 2009, the Plaintiff visited Dr. Hussey for neurological follow-ups. (Tr. 336-37, 405).  Physical examinations revealed that the Plaintiff's straight-leg raise and Bragard sign reproduce back and buttock pain on the left, that his motor exams were intact, and that he ambulated without difficulty. (Tr. 337, 405).

### E. State Agency Evaluations by Non-Examining Physicians

On August, 29, 2007, Nilsa Rivera, Ph.D., a licensed psychologist, performed a psychological evaluation of the Plaintiff. (Tr. 251).  Dr. Rivera noted that the Plaintiff had a history of alcohol use since adolescence and had often come into contact with the police as a result of his alcohol consumption habits. (Tr. 252).  Also, she noted that the Plaintiff had not received in-patient alcohol treatment, but that he had reportedly quit "cold turkey." (Tr. 252).  She concluded that the Plaintiff had alcohol dependence (in early remission) and insomnia, but still possessed "the requisite capacity and cognitive ability to manage funds, independent of others." (Tr. 253).

On August 31, 2007, James Andriole, D.O., performed a Physical Residual Functional Capacity ("RFC") Assessment of the Plaintiff. (Tr. 254-61).  In the assessment, Dr. Andriole found that the Plaintiff

could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was not limited in pushing or pulling. (Tr. 255). Also, Dr. Andriole found that the Plaintiff could never climb a ladder, rope, or scaffold, but that he could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 256).

On October 4, 2007, Sharon Ames-Dennard Ph.D., performed a Psychiatric Review Technique of the Plaintiff. (Tr. 262). She found that the Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining concentration, persistence, and pace, but that the Plaintiff had no difficulties in maintaining social function and no episodes of decompensation. (Tr. 272). Dr. Ames-Dennard concluded that "data analysis supports a not severe mental impairment." (Tr. 274).

On January 16, 2008, Robert Whittier[2] performed a RFC assessment of the Plaintiff. (Tr. 306-13). In his assessment, he found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in a 8-hour workday, and had an unlimited capability to push or pull. Furthermore, he did not find that the Plaintiff's condition caused any postural, manipulative, visual, communicative, or environmental limitations. (Tr. 308-10). Also, he noted that the Plaintiff's grip and dexterity were intact, that he suffered no motor loss, and that his gait was normal. (Tr. 307).

On January 19, 2008, B. Lee Hudson, Ph.D., performed a Psychiatric Review of the Plaintiff. (Tr. 314). He found that the Plaintiff had mild difficulties in maintaining social function, no restriction of activities of daily living, no difficulty in maintaining concentration, persistence and pace, and no episodes of decompensation. (Tr. 324). Finally, he concluded, that the totality of evidence revealed that the Plaintiff's mental symptoms were not severe. (Tr. 326).

---

[2]The record does not indicate Mr. Whittier's credentials.

-13-

### F. Testimony

On July 21, 2009, at the hearing by the ALJ, the Plaintiff testified as follows.  He stated that he had been treated by Dr. Hussey, his neurologist, for spinal problems and has had 3 epidurals for pain management. (Tr. 27).  He stated that had taken a variety of narcotics to manage the pain caused by his condition. (Tr. 28).  The Plaintiff remarked that although he has a history of alcohol abuse, he believes that he has the problem under control. (Tr. 28).  He testified that it has been 2 years since he last drank hard liquor, but that he occasionally drinks beer on the weekend. (Tr. 28).  He stated that he will not drink more than a six pack in a week. (Tr. 28).  Next, the Plaintiff testified that he has good days and bad days in regard to the pain he experiences from his condition. (Tr. 29).  The Plaintiff stated that the pain he experiences on his bad days totally debilitates him and causes him to wind up in the fetal position on the floor. (Tr. 29).  He stated that the bad days occur approximately 2 times a week to 3 or 4 times a month. (Tr. 30).  He stated that sometimes the pain lasts from 1 hour to 5 or 6 hours depending on whether he can crawl over and take his medications. (Tr. 29).  Also, he stated that the medications alleviate his pain from seriously bad to not so seriously bad. (Tr. 29-30).  The Plaintiff explained that he does household chores such as sweeping the floor, washing dishes, and doing laundry, but that on bad days it is impossible for him to do these tasks. (Tr. 31).  Approximately 12 times a month he cannot put on his own shoes. (Tr. 35).  He testified that he would have to lay down during the work day two or three times a month. (Tr. 37).  The Plaintiff estimated that he can sit for 5 to 10 minutes to 30 minutes at a time and can stand for about 2 hours a day and at most 3 to 4 hours.  He stated he could only lift about 5 to 15 pounds. (Tr. 35, 37).

A Vocational Expert ("VE"), Jeanine Salik, also testified at the hearing. (Tr. 40-45).  The ALJ posed two hypothetical questions to the VE.  The ALJ first asked,

For hypothetical number one, please assume an individual the same age, education and past work

experience as the claimant.  Further assume that such an individual can work at a light exertional level as that is described in the <u>Dictionary of Occupational Titles</u>.  Additionally, assume that such an individual could not climb ladders, ropes or scaffolds and that such individual could not work around hazardous machinery.  Could such an individual perform any of the claimant's past work? . . . Could such an individual perform any work in the regional or national economy?

(Tr. 42).  In response, the VE testified that such an individual could not perform the Plaintiff's past work, but that he could currently work as a cashier, fast food worker, or cleaner. (Tr. 43).  The VE then testified about the availability of these jobs in the nation, Florida, and the local area. (Tr. 43).  Next, the ALJ posed a second hypothetical question.  He asked,

For hypothetical two, please assume an individual the same age, education and past work experience as the claimant.  Further assume the limitations in Dr. Hussy's [sic] residual functional capacity assessment.  And those limitations include that the claimant can lift and carry five pounds, could occasionally lift up to 15 pounds, could sit without interruption for 30 minutes.  Could only occasionally climb or balance.  Could not stoop, crouch, kneel, or crawl, and would have several exacerbations per year that would interfere with his activities of daily living and prevent him from doing anything for several days at a time.  Could such an individual perform any of the claimant's past work or any other work?

(Tr. 43-44).  The VE responded that such an individual would not be able to perform the Plaintiff's past work or any other work. (Tr. 44).  Also, the VE testified that one unexcused absence per month is the maximum number of days per month an individual can be absent without being unemployable. (Tr. 44).

## III. Specific Issues and Conclusions of Law

Plaintiff raises four issues on appeal.  As stated by Plaintiff, they are: (1) the ALJ erred by failing to properly evaluate Plaintiff's subjective complaints of pain and other non-exertional symptoms under the 11th Circuit's pain standard, (2) the ALJ erred by finding that the Plaintiff maintained the residual functional capacity to perform light work after rejecting the opinion of the Plaintiff's treating physician, (3) the ALJ erred by failing to evaluate all medical opinion evidence, and (4) the ALJ erred by posing an incomplete hypothetical question to the vocational expert.

-15-

### A.     The ALJ Did Not Err In Evaluating the Plaintiff's Subjective Complaints of Pain and Other Non-Exertional Symptoms

The Plaintiff argues that the ALJ improperly discredited the Plaintiff's objective complaints of pain and other non-exertional symptoms.  The Plaintiff asserts that  the ALJ discredited the Plaintiff (1) because he failed to follow through with the treating doctor's prescribed treatment, (2) because of his past arrests, and (3) because his treating doctor required him to undergo random drug testing.   According to the Plaintiff, these facts are not probative in determining the credibility of the Plaintiff because he did not undergo surgery due to financial difficulties, because his fighting and DUI arrests occurred 10 years prior to the onset date of the claim, and because the random drug testing were always negative and Dr. Hussey indicated there was no aberrant drug behavior on the part of the Plaintiff.   Thus, the Plaintiff argues, "[t]here is no supportable or reasonable basis to reject Plaintiff's testimony." (Doc. 13 p. 12).   The Defendant contends that substantial evidence does supports the ALJ's determination that the Plaintiff's allegations of disabling pain were not credible. (Doc. 14 p. 5).

In the Eleventh Circuit, when a claimant alleges disability based on pain or other subjective symptoms, "[t]he pain standard requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If a claimant's subjective testimony of pain is supported by medical evidence that satisfies the pain standard, the claimant's testimony is itself sufficient to support a finding of disability. *Holt* at 1223.  However, an ALJ may choose not to credit such testimony. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  If the ALJ decides not to credit the testimony of the claimant

-16-

about his subjective pain, the ALJ must "articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.  If the ALJ fails to do so, then, as a matter of law, that testimony is to be accepted as true. *Id.* at 1562.

In this case, the ALJ determined "that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the ALJ's RFC assessment. (Tr. 18).  At length, the ALJ explicitly and adequately articulated his reasons for discrediting the testimony of the Plaintiff.  The ALJ noted the Plaintiff's testimony that he feared surgery. (Tr. 1).  The ALJ noted that the Plaintiff aggravated his conditions multiple times by working, contrary to his claims that he had not worked since the alleged onset date. (Tr. 18).  The ALJ noted that Dr. Hussey's regular progress notes beginning in 2003 consistently described the Plaintiff to be in a stable condition, and his pain well controlled on his medication regimen. (Tr. 19).  The ALJ noted that the Plaintiff's physical examinations generally indicated "that he had pain on the left with straight-leg raise, but that he was generally intact neurologically with normal motor and sensory exam and that he ambulated without difficulty." (Tr. 19).  The ALJ noted that Dr. Hussey occasionally suggested that the Plaintiff undergo random drug testing and that the Plaintiff occasionally escalated his medication dose on his own. (Tr. 19).  Furthermore, the ALJ noted that Dr. Hussey, after a time, did not recommend more aggressive treatment and appeared to believe, along with the Plaintiff, that the Plaintiff's pain was adequately controlled by his prescription pain medications. (Tr. 19).  The ALJ found that the Plaintiff's hospitalization for atrial fibrillation was due to alcohol withdrawal. (Tr. 19).  For these reasons, the ALJ found "that the [Plaintiff's] testimony regarding his severe, chronic back pain is not supported by the objective examination results." (Tr. 19).  The ALJ explicitly articulated his reasons for discrediting the Plaintiff's testimony.  Therefore, the ALJ did not err in evaluating the Plaintiff's subjective complaints of pain and

-17-

other non-exertional symptoms.

**B.  The ALJ Erred In Rejecting Dr. Hussey's Medical Assessment of the Plaintiff's Ability to Work**

The Plaintiff argues that the ALJ improperly disregarded the medical assessment of the Plaintiff's ability to work by Dr. Hussey. (Doc. 13 p. 13).  According to the Plaintiff, an ALJ must give substantial weight to a treating physician's opinion unless there is good cause to do otherwise. (Doc. 13 p. 14) (citing *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997).  In this case, the Plaintiff alleges there was no good cause for the ALJ to reject Dr. Hussey's medical assessment and that the ALJ "attempted to substitute his own judgment for that of the treating physician." (Doc. 13 p. 16).  The Defendant argues that the ALJ properly weighed the opinion of Dr. Hussey, but rejected his medical assessment of the Plaintiff because it was inconsistent with the objective findings of record. (Doc. 14 p. 10).

An ALJ must give substantial or considerable weight to the testimony of a treating physician unless good cause is shown to the contrary. *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Good cause exists for an ALJ to discredit the treating physician's report when "it is not accompanied by objective medical evidence or is wholly conclusory." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  Furthermore, good cause exists where the evidence supports a contrary finding and where the doctors' opinions were inconsistent with their own medical records. *Lewis* at 1440.  Finally, an ALJ must clearly articulate his or her reasons for disregarding the opinion of the treating physician. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

In his opinion, the ALJ held that good cause existed to discredit Dr. Hussey's medical assessment to do work because it was not supported by Dr. Hussey's own examination findings. (Tr. 20).  Specifically,

the ALJ remarked that Dr. Hussey's medical assessment of the Plaintiff's ability to work was inconsistent with his previous examination findings that "the [Plaintiff] had no sensory or motor deficits and that he was able to ambulate normally." (Tr. 20).   Furthermore, the ALJ discredited Dr. Hussey because his assessment was based on the Plaintiff's MRI, which the ALJ incorrectly asserted was not in the record. (Tr. 20).   The ALJ concluded that there is no indication that the Plaintiff cannot perform the level of work found in the ALJ's RFC assessment. (Tr. 20).

In this case, good cause did not exist to discredit the medical opinion of the Plaintiff's treating physician and, therefore, the ALJ erred by failing to accord Dr. Hussey's opinion of the Plaintiff's ability to work substantial weight.   Having examined the Plaintiff approximately once every 3 months over a 10 year period, Dr. Hussey possessed intimate knowledge of the Plaintiff's medical condition and ability to do work.   Given this intimate knowledge, the ALJ should have given Dr. Hussey's assessment substantial deference in determining his own RFC assessment.   Contrary to the ALJ's claim, Dr. Hussey's assessment of the Plaintiff's ability to work is consistent with and supported by his previous examination findings. For over a decade, Dr. Hussey noted after every follow-up visit that the Plaintiff's left leg and lower back pain persisted.   This pain was consistently reproduced in physical examinations by the Plaintiff's straight-leg raise and Bragard sign.   Furthermore, Dr. Hussey's examination findings that the Plaintiff could ambulate without difficulty and had no sensory or motor impairments do not contradict his medical assessment of the Plaintiff's ability to work.   These findings represent Dr. Hussey's observations of the Plaintiff during his brief neurological visits and are not indicative of Dr. Hussey's opinion regarding the Plaintiff's ability to perform prolonged work activity.   When specifically asked to give his opinion of the Plaintiff's ability to work, Dr. Hussey found that the Plaintiff could only carry up to 5 pounds, could occasionally lift and carry up to 15 pounds, could stand/walk and sit for 30 minutes without interruption,

and could occasionally climb and balance but could never stoop, crouch, knell, or crawl. (Tr. 377-80). Dr. Hussey based these findings on his myriad examinations of the Plaintiff and on the Plaintiff's MRI, which the ALJ incorrectly remarked was not in the record.

The ALJ did not have good cause to reject Dr. Hussey's medical assessment report. Dr. Hussey possessed an intimate knowledge of the Plaintiff's medical condition and based his assessment of the Plaintiff's ability to work upon this knowledge. Despite the fact that Dr. Hussey had been the Plaintiff's treating physician for over a decade and had performed over 50 physical examinations of the Plaintiff in that time, the ALJ summarily discredited Dr. Hussey's assessment in just two sentences, one of which was factually wrong. For these reasons, the ALJ erred in failing to explain more precisely his reasons for rejecting the medical opinion of Dr. Hussey.

### C. The ALJ Erred in Failing to State the Weight He Accorded to All Medical Evidence

The Plaintiff argues that the ALJ erred by failing to mention and discuss the weight he accorded to non-treating physician Dr. Andriole's RFC assessment pursuant to SSR 96-6(p). (Doc. 13 p. 18). The Defendant argues that the ALJ referenced and expressed the weight given to Dr. Andriole's assessment. (Doc. 14 p. 13).

An ALJ must state with particularity the weight he accorded the different medical evidence of record. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). According to Social Security Ruling 96-6(p)[3], the "findings of fact made by State agency medical . . . consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review." An ALJ

---

[3]The Social Security Administration's rulings are not binding on this court, however, they are accorded great respect and deference. *See Klawinski v. Commissioner of Social Security*, 391 Fed. App'x. 772, 775 (11th Cir. 2010).

may not ignore these opinions and must explain the weight given to these opinions in their decisions. SSR 96-6(p).  Furthermore, under 20 C.F.R. § 404.1527(f)(2)(ii), when an ALJ does not accord a treating physician's opinion controlling weight, he must explain in his decision the weight given to the opinions of a State agency medical consultant.

In this case, the ALJ specifically did not accord the opinion of the Plaintiff's treating physician, Dr. Hussey, substantial weight. (Tr. 19).  Therefore, pursuant to 20 C.F.R. § 404.1527(f)(2)(ii), the ALJ was required to explain in his decision the weight he gave to the opinions of the State agency medical consultant.  The ALJ's opinion failed to do so.  Although the Defendant claims the ALJ referenced Dr. Andriole's assessment in stating there was no contrary evidence for the ALJ's finding, such a reference lacks sufficient particularity and does not evidence the weight the ALJ accorded Dr. Andriole's opinion.

Furthermore, although the ALJ's RFC and Dr. Andriole's RFC both limit the Plaintiff to a range of light work with some postural limitations, the difference in their findings is material.  The ALJ and Dr. Andriole both found that the Plaintiff could never climb a rope, ladder, or scaffold, but only Dr. Andriole found that the Plaintiff could only occasionally stoop, kneel, crouch or crawl. (Tr. 17, 256).  This difference in limitations is important because it could alter the testimony of the VE in regards to the Plaintiff's ability to find employment in the regional or national economy.  According to the VE, Jeanine Salik, "restrictions on stooping, even according to definition, sedentary work requires occasional stooping." (Tr. 44).  If the ALJ adopted the additional limitations of Dr. Andriole it is unclear whether the Plaintiff could perform jobs in the regional or national economy.

The ALJ's opinion fails to reference and state the weight accorded to the RFC assessment of

Dr. Andriole.  Thus, because he was required to do so by law and because the differences between the ALJ's and Dr. Andriole's RFC are material to a determination of the Plaintiff's disability, the ALJ has erred.

### D. The ALJ Erred in Posing an Incomplete Hypothetical Question

The Plaintiff argues that the ALJ erred by posing a hypothetical question that did not accurately reflect all of the Plaintiff's limitations.  According to the Plaintiff, the ALJ's first hypothetical question should have contained the additional limitations of Dr. Hussey's medical assessment and the occasional postural limitations found in Dr. Andriole's RFC evaluation. (Doc. 13 p. 19-20).  The Defendant argues that the hypothetical question sufficiently encapsulated the Plaintiff's limitations and the record as a whole fails to support further limitations. (Doc. 14 p. 16).

Once a Plaintiff proves that he can no longer perform his past relevant work due to disability, the burden shifts to the ALJ to prove the existence of other jobs in the national economy that the Plaintiff can perform despite his impairments. *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  Where a Plaintiff primarily suffers from an exertional impairment, without significant non-exertional factors, an ALJ may meet this burden through a straightforward application of the Medical-Vocation Guidelines (the "grids"). *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  However, exclusive reliance upon the grids is inappropriate when the Plaintiff's impairments are significantly non-exertional. *Foote* at 1559.  In such a case, an ALJ may rely on the testimony of a VE to prove that the Plaintiff can perform other jobs despite his impairments. *Id.* For the VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which includes all of the Plaintiff's impairments. *Jones* at 1229.

In this case, the ALJ found that the Plaintiff could no longer perform any past relevant work

pursuant to 20 C.F.R. § 404.1565  and 20 C.F.R. § 416.965. (Tr. 20).  Thus, the burden shifted to the

ALJ to prove the existence of jobs in the national economy that the Plaintiff could perform despite his

impairments.  To determine the extent that the Plaintiff's additional limitations prevented him from

performing unskilled light work, the ALJ posed a hypothetical question to the VE to determine whether

jobs exist in the national economy for an individual with the claimant's age, education, work

experience, and RFC. (Tr. 21).  Specifically, the ALJ asked:

> For hypothetical number one, please assume an individual the same age, education and past
> work experience as the claimant.  Further assume that such an individual can work at a light
> exertional level as that is described in the Dictionary of Occupational Titles.  Additionally,
> assume that such an individual could not climb ladders, ropes or scaffolds and that such
> individual could not work around hazardous machinery . . . Could such an individual perform
> any work in the regional or national economy?

(Tr. 42-43).  To which the VE responded, "Yes," and then explained that the Plaintiff could work as a

cashier, fast food worker, and cleaner at the light level. (Tr. 43).

As shown above, the ALJ erred by discrediting Dr. Hussey's medical assessment of the

Plaintiff's ability to work. (Tr. 20).  Because Dr. Hussey's opinion should have been accorded

substantial weight, the ALJ should have included these limitation findings in the first hypothetical

question and he has erred by failing to do so.  Likewise, as shown above, the ALJ failed to properly

consider Dr. Andriole's RFC assessment.  When the ALJ erred by not considering Dr. Andriole's RFC

assessment, he also erred in not including the limitation findings in the hypothetical question or

articulating reasons why these limitations should not be included in the hypothetical.

**IV. Conclusions**

While remanding this case for further consideration, this Court expresses no views as to what

the outcome of the proceeding should be.  At the reopened proceeding, each party shall have the

opportunity to submit additional evidence.

**IT IS HEREBY ORDERED:**

1.   The decision of the Commissioner is **AFFIRMED** as to the ALJ's evaluation of the Plaintiff's subjective complaints of pain and other non-exertional symptoms.  The ALJ's decision is consistent with the requirements of law and supported by substantial evidence.

2.   The decision of the Commissioner is **REVERSED** as to the ALJ's rejection of the treating physician's opinion regarding the Plaintiff's ability to perform work.  The ALJ failed to demonstrate good cause to reject Dr. Hussey's RFC assessment.  The decision is **REMANDED** with instructions for the ALJ to appropriately evaluate Dr. Hussey's RFC assessment and to properly explain the weight he accorded it in formulating his own RFC assessment pursuant to 20 C.F.R. § 404.1527(d).

3.   The decision of the Commissioner is **REVERSED and  REMANDED** as to the ALJ's failure to state the weight accorded Dr. Andriole's RFC assessment.  The decision is **REMANDED** with instructions for the ALJ to specifically address the RFC findings of Dr. Andriole, to state the weight he accorded Dr. Andriole's RFC, and to state the reasons why the his findings differ from Dr. Andriole's.

4.   The decision of the Commissioner is **REVERSED and  REMANDED** in regards to the hypothetical question posed by the ALJ to the VE.  The ALJ should have included Dr. Hussey's limitation findings in the hypothetical question.  Also, after a review of Dr. Andriole's RFC assessment, the ALJ may be required to include Dr. Andriole's limitation findings in the hypothetical question presented to a VE.

5.   The Clerk of Court shall enter judgment **AFFIRMING in part** and **REVERSING and REMANDING in part** the decision of the Commissioner pursuant to sentence four of 42 U.S.C. §

405(g) and **REMAND** this case to the Commissioner for further proceedings.  Thereafter, the Clerk shall close this file.

      **DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this 28th day of June, 2011.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record